**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Albert Solomon PRESTON, Jr., Defendant-Appellant.**

No. 78–5280.

United States Court of Appeals, Fifth Circuit.

Dec. 20, 1979.

---

Guy J. Notte, Lithonia, Ga. (Court-appointed), for defendant-appellant.

William G. Boyd, Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before COLEMAN, Chief Judge, and BROWN and TJOFLAT, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case presents yet another chapter in the continuing story of the $184,000 armed bank robbery of the First National Bank and Trust Company (Cherokee Branch), a federally insured institution located in Macon, Georgia.[1] Appellant Albert S. Preston, Jr., was indicted on three counts of bank robbery, 18 U.S.C.A. §§ 2113(a), (b), (d), and 2, and one count of conspiracy, *id.* § 371. In the first of two trials, the Trial Court declared a mistrial since the jury could not reach a verdict after over 13 hours of deliberation. In the second trial, Preston was convicted on all four counts. He received a 25 year prison sentence on the substantive counts and a consecutive five year probationary sentence on the conspiracy count.

Preston now appeals his conviction on six separate grounds: (1) lack of probable cause for arrest and improper admission of inculpatory statements tainted by the illegal arrest; (2) refusal of the Trial Court to permit an F.B.I. agent to be called as a hostile witness and questioned about fingerprint and other tests performed by the F.B.I.; (3) prejudicial remarks by the Trial

---

1. The robbery, which occurred on December 15, 1977, involved four men. Ronald C. Williams pleaded guilty to one count of his four count indictment and agreed to testify against his codefendants. David McGee and Willie Earl Johnson were convicted on all four counts of their indictments. We affirmed these latter two convictions in *United States v. Johnson,* 5 Cir., 1979, 588 F.2d 961. We now review the conviction of the fourth and final participant.

Court; (4) improper limitation on the scope of cross-examination of two Government witnesses; (5) withholding of exculpatory evidence by the prosecution; and (6) admission of Preston's former bank robbery conviction in violation of Rule 609(a)(1) of the Federal Rules of Evidence. We reject the first five claims and conditionally affirm the conviction subject to further determination by the Trial Court as to the sixth claim, the admissibility of Preston's prior bank robbery conviction.

### Probable Cause Or Cause For Appeal?

Preston argues that the Macon police lacked probable cause to arrest him and that any inculpatory statements made by him were tainted by this illegal arrest and should not have been admitted into evidence. As we discuss in detail below, Preston was taken from a home located near the robbery to the First National Bank for a lineup. After the lineup, he was placed under arrest and was taken to police headquarters.

At the police headquarters, Preston allegedly made a variety of inculpatory statements. Special F.B.I. Agent Vasquez testified at length during the second trial regarding Preston's statements at the police station.[2] A brief account of Vasquez's testimony follows.

Vasquez testified that Preston, after receiving his *Miranda* warnings, revealed that on the night prior to the robbery his friend David McGee and two other men visited the home of Preston's grandmother, where Preston had arrived earlier that day. At that time Preston was asked to be the fourth participant in a robbery to be carried out

the following day. Preston also told Vasquez the details of what transpired the next day. At about eight thirty in the morning, McGee and the two other men picked up Preston. The four then went to a house located on Roy and Courtland Streets to discuss final details before proceeding to the First National Bank. Preston, who was carrying a gun, went to the back door of the bank with one of the men and McGee went to the front door with the other one. Preston told Vasquez that all four of the robbers were wearing ski or stocking masks. Preston also stated that one of the other three (he thought McGee) went around to the various tellers' cages collecting money. The four then ran from the bank through some backyards and arrived at 2651 Roy Street. David McGee soon left the Roy Street house and Preston followed him. They both arrived at the McGee home.[3]

Analysis of Preston's challenge to the admission of inculpatory statements requires a two-step determination. We must first decide whether probable cause existed for Preston's arrest. If probable cause did not exist, we must then decide whether, in spite of the illegal arrest, the inculpatory statements "were obtained by exploitation of the illegality of his arrest" or instead "were of sufficient free will as to purge the primary taint of the unlawful arrest." *Brown v. Illinois,* 1975, 422 U.S. 590, 600, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416, 425. See also *Dunaway v. New York,* 1979, —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824.

We first examine the issue of probable cause. The following facts were developed by the first Trial Court on appellant's pre-

---

**2.** Preston made nearly all of his inculpatory statements between one and five p. m. on the day of the arrest. Macon Police Sergeant Hernandez was also present during these hours. Hernandez appeared as a rebuttal witness during the second trial and confirmed most of what Vasquez had stated, except that Hernandez claimed that Preston at first denied any involvement in the robbery but soon admitted his role.

**3.** In addition to revealing the above facts, Preston also drove with Vasquez and Hernandez to 2651 Roy Street and pointed out the house

where the robbers met both before and after the robbery. On the basis of Preston's statements and identification of the Roy Street house, search warrants were issued for the Roy Street house and the McGee house. At the Roy Street house, police found money and other items believed to be related to the robbery. At the McGee house, a jacket was found which was also believed to be related to the robbery. Preston challenges not only the admission of testimony regarding the inculpatory statements, but also the admission of any items seized as a result of these search warrants.

trial motion to suppress inculpatory statements for lack of probable cause to arrest. On December 15, 1977, at 9:48 a.m., Captain Robert Freeman of the Macon Police Department learned over police radio that the Cherokee Branch of the First National Bank and Trust Company had just been held up. According to the police broadcast, the robbery was carried out by four black men in their early twenties wearing blue jackets and stocking masks.

At about 10:25 a.m., Freeman learned through a second police broadcast that several items believed to be connected to the robbery, including money and two windbreaker jackets, were found about three blocks from the bank on Courtland Street. After first driving to the location of these items, Freeman proceeded in the probable direction of the robbers. He learned from another officer that witnesses had seen two black males running between two houses located on Roy and Courtland Streets. Behind these houses were footprints leading to a home across the street from the home of Katie McGee. Since Freeman knew Mrs. McGee personally, he decided to obtain her assistance in talking with her neighbor across the street.

Upon entering the McGee home, Captain Freeman saw appellant, a black male in his early twenties, sitting in the den. David McGee, Katie McGee's son, was also at the McGee home. Captain Freeman announced that he was looking for the robbers of the First National Bank and Trust Company. Katie McGee took Freeman across the street but no information was obtained from the neighbor. Freeman did, however, question Katie McGee, and learned that Mrs. McGee did not know Preston by name, that he was a friend of her son's, and that Preston had arrived at the McGee home only ten or fifteen minutes before Freeman.

When Freeman returned to the McGee house with Mrs. McGee, he noticed that appellant had changed his hair style from braided to unbraided. When questioned by Freeman, appellant stated that he lived in Atlanta, Georgia. Freeman suggested that appellant go outside and talk to Detective Davis. In response to Davis's questions, Preston stated that he lived in Macon, worked in Atlanta, but that he commuted home to Macon only on weekends. Yet appellant was then in Macon on a Thursday.

While Davis was questioning appellant, Freeman learned from Mrs. McGee that Preston was wearing a black knit cap, a T-shirt, and jeans when he arrived at the McGee home. Freeman learned from David McGee that appellant had arrived with another black male, who did not enter the McGee home.

■ Appellant then accompanied the officers to the First National Bank for questioning and identification. The Trial Court specifically found that Preston consented to accompany the officers to the bank and that he was at that time not under arrest.[4]

On the way to the bank, Preston revealed that he had robbed a bank in 1971 and was currently on probation after serving seven years in prison. He also appeared confused when asked how he had arrived in Macon, first stating that he drove, then stating that he took the bus. He also stated that he had walked to the McGee home on what the Trial Court found—not without support in the record—to be a rather chilly day.

■ After conducting an inconclusive lineup at the bank, Macon Police Sergeant Hernandez put Preston in his car. The Trial Court found, and we agree, that at this point Preston was under arrest, since his freedom to walk away was restrained. See *United States v. Brunson,* 5 Cir., 1977, 549 F.2d 348, 357, *cert. denied,* 1978, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107. The Trial Court concluded, based on the forego-

---

4. The Court determined that Preston was not in any way restrained at that time and would have been allowed to leave had he asked. After a careful reading of the record, we find that the Trial Judge's conclusion that Preston voluntarily accompanied the police to the bank and was not at that time under arrest is not clearly erroneous. See *United States v. Brunson,* 5 Cir., 1977, 549 F.2d 348, 356–58, *cert. denied,* 1978, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107. Cf. *United States v. Bailey,* 5 Cir., 1971, 447 F.2d 735, 737 (consent to search).

ing facts, that at the time of arrest, the arresting officer had probable cause.

 Probable cause to arrest exists "where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States,* 1964, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332, quoting *Carroll v. United States,* 1925, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555. Although more than mere "reasonable suspicion" is required, "the arresting officer need not have in hand evidence sufficient to convict." *United States v. Rieves,* 5 Cir., 1978, 584 F.2d 740, 745. In determining probable cause, "we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 1949, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890.

 We conclude that, under the applicable legal standards, the Trial Court had sufficient basis for finding that probable cause existed at the time of arrest,[5] i. e., after the lineup at the bank. In his thorough memorandum opinion, the Trial Judge analyzed the facts in the hands of the arresting officer as follows:

> [T]he location of the McGee house was consistent with the hot trail left by two running men soon after the robbery. Preston arrived at the house accompanied by another black male. The timing of his arrival was ripe to make him a suspect.

After hearing that Captain Freeman was investigating the bank robbery and perhaps thinking that Freeman was not going to return to the McGee house, Preston changed his hair style, suggesting a guilty man's desire to alter his physical appearance. The day was chilly enough for Preston to have a knit hat, and yet he did not have a coat though he had walked to the McGee home. Two windbreakers, believed to have been discarded by the robbers, had earlier been found. Preston gave inconsistent statements concerning where he worked and lived. Further, the last of those statements had him working in Atlanta on weekdays, but he was then in Macon on a Thursday. Finally, he announced prior involvement with a bank robbery and the recent completion of a seven year period of confinement.

As a matter of hindsight, some of the facts in the hands of the police officers may appear to be of somewhat questionable importance. Yet we will not overturn a finding of probable cause by dissecting one or two of the many factual considerations in the minds of the arresting officers. We think it clear that the facts in the hands of the arresting officers were, *when taken as a whole,* sufficient for the officers to reasonably believe that Preston was a participant in the Macon bank robbery. The Trial Court was therefore correct in finding probable cause.

 Even assuming the arresting officers did not have probable cause to arrest Preston, we think that the inculpatory statements were properly admitted into evidence.[6] The facts surrounding Preston's interrogation are easily summarized. Pres-

---

5. The fact that Freeman did not himself arrest Preston is not relevant to the determination of probable cause. We have observed that " 'probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest,' when there is 'some degree of communication between the two.' " *United States v. Ashley,* 569 F.2d 975, 983, quoting *Moreno-Vallejo v. United States,* 5 Cir., 1969, 414 F.2d 901, 904, *cert. denied,* 1970, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76. Here, there was clearly communication among the police officers.

6. We do not think it is relevant that the inculpatory statements being challenged were disclosed through the testimony of a witness rather than through a signed confession. If Preston's inculpatory statements were tainted by an illegal arrest, then Vasquez should not have been allowed to testify as to the substance of the statements. See, e. g., *Thomas v. United States,* 5 Cir., 1967, 377 F.2d 118.

ton's inculpatory statements were made at the police station following a lineup conducted at the First National Bank. When Preston arrived at the bank, Vasquez identified himself. Although Preston first stated that he did not wish to speak to Vasquez, he soon changed his mind. After the lineup, Preston, who was sitting in a police car, motioned for Vasquez to come over to him. Preston indicated a desire to talk, so Vasquez gave Preston his *Miranda* warnings. However, before Preston could say anything other than his name and address, Vasquez was interrupted by a fellow F.B.I. agent. Subsequently, Vasquez and a Macon police officer accompanied Preston to the police station. It was then, during interrogation between one and five in the afternoon, that Preston made the inculpatory statements. Preston was advised of his *Miranda* rights at this time. Vasquez also interviewed Preston for about twenty minutes at the Bibb County Jail at two o'clock the following morning in an attempt to discover the location of the money not yet recovered. This interview, also preceded by *Miranda* warnings, revealed no new information. The only thing Preston told Vasquez was that the last time he saw any of the money was right after the robbery, when the money was brought to Roy Street.

The standards for determining the admissibility of inculpatory statements made subsequent to an illegal arrest have been articulated and refined in recent years. See *Brown v. Illinois, supra; Wong Sun v. United States,* 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The Supreme Court's most recent statement is *Dunaway v. New York, supra.* In *Dunaway,* a police officer arrested the defendant for murder on the basis of a lead from a jail inmate awaiting trial for burglary. The police officer, although admitting that the information supplied was clearly insufficient to obtain a warrant, nonetheless brought the defendant to police headquarters for questioning. After being given *Miranda* warnings, defendant drew sketches and made statements that incriminated himself. Relying on its previous decisions, the Court reversed Dunaway's conviction because his inculpatory statements were wrongfully admitted into evidence. As the Court reasoned:

> [*Brown v. Illinois*] articulated a test designed to vindicate the "distinct policies and interests of the Fourth Amendment." Id., [422 U.S.] at 602, 95 S.Ct. 2254, 45 L.Ed.2d 416. Following *Wong Sun,* the Court eschewed any per se or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest," id., at 600, 95 S.Ct. 2254, 45 L.Ed.2d 416; see *Wong Sun v. United States,* [supra]. *Brown's* focus on "the causal connection between the illegality and the confession," 422 U.S. at 603, 95 S.Ct. 2254, 45 L.Ed.2d 416, reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

> *Brown* identified several factors to be considered "in determining whether the confession is obtained by exploitation of an illegal arrest[:] [t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . .. And the burden of showing admissibility rests, of course, on the prosecution." Id., at 603–604, 95 S.Ct. 2254, 45 L.Ed.2d 416. Examining the case before it, the Court readily concluded that the State had failed to sustain its burden of showing the confession was admissible. In the "less than two hours" that elapsed between the arrest and the confession "there was no intervening event of significance whatsoever." Ibid. Furthermore, the arrest without probable cause had a "quality of purposefulness" in that it was an "expedition for evidence" admittedly undertaken "in the hope that something might turn up." Id., at 605, 95 S.Ct. 2254, 45 L.Ed.2d 416.

The situation in this case is virtually a replica of the situation in *Brown*. Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. Nevertheless, three members of the Appellate Division purported to distinguish *Brown* on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal seizure and detention) and that the police conduct was "highly protective of defendant's Fifth and Sixth Amendment rights," . . . This betrays a lingering confusion between "voluntariness" for purposes of the Fifth Amendment and the "causal connection" test established in *Brown*. Satisfying the Fifth Amendment is only the "threshold" condition of the Fourth Amendment analysis required by *Brown*. No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." [Quoting authority.]

—— U.S. at ——, 99 S.Ct. at 2259–2260, 60 L.Ed.2d 824, 839–40.

We think this case is distinguishable from *Dunaway* and *Brown* in several ways. As interpreted in *Dunaway*, *Brown* emphasized that although a variety of factors are important in analyzing whether a confession stemmed from exploitation of the illegal arrest, the most important factor is the nature of the police conduct. In both *Dunaway* and *Brown*, the Court revealed that not even an arguable basis for probable cause could be found.[7] Here, however, the police were not merely "hop[ing]" that something might turn up." Rather, they were convinced they had the right man based on what they had already learned. This belief was reasonably supported by the totality of the circumstances. Indeed, the evidence of probable cause was sufficient to convince the Trial Court that the arrest was proper.

Moreover, while the facts in both *Dunaway* and *Brown* seem to suggest that in general, the shorter the period between the arrest and the inculpatory statement, the more likely it is that the statement is tainted by the illegal arrest, the concept of "temporal proximity" cannot be so easily isolated. In a concurring opinion in *Dunaway*, Justice Stevens elaborated on the "temporal proximity" factor discussed in that case, stating that "the temporal relationship between the arrest and the confession may be an ambiguous factor . . . [E]ven an immediate confession may have been motivated by a prearrest event such as a visit with a minister." —— U.S. at ——, 99 S.Ct. at 2260, 60 L.Ed.2d at 841.

We believe that this case, like the hypothetical posed by Justice Stevens, should not be judged by mechanically looking at the lapse of time between the arrest and the statements. Here, for whatever reasons, Preston decided on his own that he wished to talk to Agent Vasquez.[8] The fact

---

7. The Court stated in *Brown*:

 The illegality here . . . had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or "for questioning." . . . The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.

 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed. 2d at 428. Similarly, in *Dunaway*, the police had recognized, the state had conceded on appeal to the Supreme Court, and each of the state courts had found that the police officers clearly did not have probable cause. See —— U.S. at ——, —— and ——, 99 S.Ct. at 2251, 2253, and 2260, 60 L.Ed.2d at 829, 831, and 840.

8. According to Vasquez's testimony at the second trial, Preston

 hit on the car with his hand or his foot or whatever, indicating that he wanted me to come over to the car to talk with him . . . . I turned around and discontinued talking to whoever I was interviewing, walked over to

that Vasquez began interrogation at once upon arriving at the police station stemmed from the fact that Preston had earlier wanted to talk but was not given a chance because Vasquez was interrupted. We do not believe that, under such circumstances, the police must postpone any discussion with a suspect for hours or even days. We think that Preston's own voluntary desire to come forward and talk before being subjected to the rigors of police house interrogation suggests that his statements were not tainted by what we assume to be an illegal arrest.

We also point out that *Miranda* warnings were repeatedly given. Although this was true both in *Dunaway* and *Brown* as well, the state court decisions being reviewed in those cases were premised on the idea that these warnings were *without more* sufficient to remove any taint surrounding the confession. As the Court emphasized in *Brown*, "[O]ur holding is a limited one. We decide only that the Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest." 422 U.S. at 605, 95 S.Ct. at 2262–63, 45 L.Ed.2d at 428. The Court recognized that "the *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest." *Id.* at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427.

In sum, we hold that because the arrest was not investigatory, because Preston, not the police, truly got the interrogation rolling, and because *Miranda* warnings were repeatedly given, Preston's inculpatory statements were not tainted by what we have assumed in this discussion to be an illegal arrest.

### Should a Witness Have Been Allowed To Tell All He Does Not Know?

■ Appellant next contends that the Trial Court improperly prevented him from calling F.B.I. Special Agent Richard Bigler to testify regarding fingerprint, hair, and other tests performed in the course of the F.B.I.'s investigation of the robbery. Bigler did not himself perform the tests. The tests were carried out by agents in Washington, D. C. At no time did appellant attempt to subpoena the individuals who actually performed the tests. In the first trial, the Trial Court allowed Preston to call Bigler to the stand to read the inconclusive results of the Washington, D. C. tests to the jury. In the second trial, the Trial Court expressed concern that Bigler's reading of the results would constitute inadmissible hearsay. The Court indicated that it would so rule if the issue arose. Instead of contesting the matter or pressing it further, appellant reached an agreement with the Court: Bigler would not be called to read the report, but appellant would be permitted to argue to the jury lack of conclusive fingerprint or other evidence.[9] Hence, ap-

---

the car and said, do you want me, and he said, yeah, I want to talk to you.

During pretrial motions, Macon Police Sergeant Hernandez, who observed this exchange between Preston and Vasquez, told an account of these events similar to that given by Vasquez.

9. As the record indicates, the following colloquy ensued:

The Court: It's obvious, perfectly obvious, that the Government doesn't have any positive identification of any fingerprint of the defendant. Mr. Notte [defense attorney], that's obvious. Why belabor the point? Just one more thing and I'll let you finish. Why belabor the point? We know—anybody with any sense knows that if the government had positive fingerprints, shoe prints or hair identification of the defendant, it would be in evidence before the jury. We don't have it. Now, all of this

that you're trying to show is that they don't have it. You can assume that they don't find it. You can assume that if they sent anything off, the report was negative. You could probably argue that to the jury.

Mr. Notte: I didn't realize that, your Honor. I didn't want to get into a situation—

The Court: Couldn't he argue that to the jury? There's no positive fingerprint identification of my client? Don't you know, Members of the Jury, if they had a positive fingerprint identification, you would have heard about it. I think I'll let him make that argument. That's all you want to make isn't it?

Mr. Notte: That and the hair.
The Court: Hair and footprint?
Mr. Notte: Yes.

The Court: Okay, I think we've solved it. It's a question—any inference you can draw, okay. Does that solve our problem?

pellant waived any objection he might have had. Moreover, in closing argument, appellant's lawyer emphasized the inconclusive nature of the F.B.I. tests.[10] Thus, even assuming appellant did not waive his objection, it is hard to imagine how he was prejudiced by not being able to elicit the inconclusive test results from Bigler. The jury was fully aware that if the F.B.I. results were positive, such results would have been presented in court.

### Damaging Remark Or Harmless Slip Of The Tongue?

Preston next contends that he was prejudiced by a comment of the Trial Judge made during cross-examination of a Macon police officer. The pertinent part of the colloquy is as follows:

Q Mr. Notte [defense counsel]: Was [Preston] under arrest before he went in the line-up?

Mr. Boyd [prosecutor]: I object, your Honor. The Court has previously ruled on that pre-trial motion. We've already had that question come up.

Mr. Notte: May I ask whether he was placed under arrest after the line-up, your Honor?

The Court: *If that'll help you and satisfy you, yes.* (Emphasis added.)

Appellant contends that "by intimating that the defendant needed help or needed to be satisfied," the comment had "the effect of causing the Jury to prejudicially question the defendant's motives in such cross-examination."

We of course recognize "the great weight that a jury undoubtedly attributes to judicial comments." *United States v. Onori,* 5 Cir., 1976, 535 F.2d 938, 943. On the other hand, we will not reverse a conviction unless the comments of the Trial Judge are so prejudicial as to amount to a denial of a fair trial. See *Moody v. United States,* 5 Cir., 1967, 377 F.2d 175, 180, *quoting Graham v. United States,* 4 Cir., 1926, 12 F.2d 717, 718.

In *United States v. Onori, supra,* we identified three factors which have been important in previous cases holding that comments of the Trial Court did not amount to reversible error. These are: (1) the comments "occupied but a few seconds of a lengthy trial;" (2) the comments "were directed to defense counsel rather than to the jury;" and (3) the Trial Judge advised the jury to disregard any intimation by the Court relating to the facts of the case. *Id.* at 944. Each of these factors is present here. The Court's comment occupied a very short moment of the trial. It was directed to Preston's attorney, not to the jury. Finally, the Trial Judge specifically charged the jury that the Court has not expressed any views as to the facts of the case.[11] We

---

Mr. Notte: Your Honor, I believe so. I certainly at the end of this case didn't want to get into a mistrial situation or an argument with the court.

The Court: Very well, you can argue the lack of evidence as well as evidence. There's no question about that and it avoids this possibility and deep problem of whether this report is pure hearsay evidence. I rather think it is. * * *

**10.** Defense counsel argued:

Now if [the F.B.I. has] all these resources, bring in and show to you the fingerprints that matched the Magnum, show the hair samples. They got a hair sample from his head, they compared it, they did something. They got a hair sample for one reason or another. Did you hear any agent get up and say it matched the hood, it matched this or it matched that? Did you hear any agent get up and say that they found his fingerprints

on the Magnum? Don't forget if you believe what they say, you have to believe that he ran with the money down Courtland, threw the Magnum down, it was recovered sometime later. You'll see the pictures. You'll have all that money and all those wrappers. If they had one iota of fingerprint evidence, of hair sample evidence that would come close to tying him into this case, I'm telling you they would still have testimony and evidence coming in. But they don't. They don't. They don't because they can't. * * *

**11.** The Trial Judge stated:

The Court, of course, has not intimated and will not plan to intimate any opinion one way or the other with respect to the factual issues involved in this case, preferring to leave the resolution of those issues entirely up to this jury unto your enlightened consciences.

thus find that the Trial Court's comment "If that'll help you and satisfy you" does not warrant reversal.

### Unfair Limitation On The Scope Of Cross-Examination?

Preston contends that the Trial Court committed reversible error by limiting the scope of cross-examination of two Government witnesses. The first witness was Mary Glover, common law wife of Ronald Williams.[12] Appellant's attorney attempted to question Glover about two individuals, Ronnie and Kenny Smith, who formerly resided at the Williams's home. The attorney was apparently attempting to raise suspicion about a possible role of the Smiths in the robbery,[13] even though not one whit of evidence was introduced to support any role of the Smiths. The Court refused to allow this line of questioning. The second witness was Lynn Dean, who viewed the lineup at which Preston participated. During cross-examination, Dean testified that she had not obtained a full facial view of the robbers at the time of the robbery. Appellant's attorney apparently sought to make Dean admit that she *did* have an opportunity to view the robbers yet *still* could not identify Preston at the lineup. The Trial Judge cut off this line of questioning, observing that Dean "did not have sufficient opportunity to identify a man with a stocking mask on his face."

 It has been consistently held that the Trial Court may place limitations on the scope of cross-examination in the exercise of sound discretion. See, e. g., *United States v. Alford*, 1931, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624, 629; *United States v. Siegel*, 5 Cir., 1979, 587 F.2d 721, 726. There is not the slightest indication that had the questioned examination been pursued, anything of value to the defense would have emerged. Under the circumstances, we cannot say that the Trial Court abused its discretion.

### Withholding Of Exculpatory Evidence By The Prosecution?

Preston learned during the first trial that the confession of Ronald Williams, who pleaded guilty and testified against Preston, had been tape recorded. Although Preston had been given a copy of Williams's transcribed and signed confession, he nonetheless claims that the failure of the United States to turn over the tape recording itself constitutes withholding of exculpatory evidence under *Brady v. Maryland*, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *United States v. Agurs*, 1976, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342.

 To make out a successful claim under *Brady* and *Agurs,* three factors must be established: "(1) the prosecutor's suppression of the evidence, (2) the favorable character of the suppressed evidence for the defense, and (3) the materiality of the suppressed evidence." *United States v. Delk*, 5 Cir., 1978, 586 F.2d 513, 518. Appellant has failed to establish *any* of these three factors.

To begin with, the record clearly rebuts any claim that the United States *suppressed* the recording. The Government simply assumed—quite reasonably—that the recording itself need not be produced because the transcript was available. Preston learned about the tape during the first trial, but did not even try to obtain it until the conclusion of the Government's case in the second trial. When Preston's attorney raised the matter, the Assistant United States Attorney readily agreed to make the tape available. As the Assistant U.S. Attorney stated: "if [defense attorney] has any contention, we'll be glad to make the tape recording available to him tonight. If he wishes to have it transcribed, he may do so." The next day the following colloquy ensued:

Mr. Boyd [prosecutor]: And the other point I wanted to make known to court [is that] I advised Mr. Notte last night that the tapes of Ronald Clyde Williams who testified are available to him for transcription. He advised me that he did

---

12. Ronald Williams pleaded guilty to the robbery and testified against Preston. See note 1, *supra*.

13. Both the Smiths were black; Ronnie Smith was in his twenties.

not wish to have it transcribed. He has been provided and it has been introduced into evidence a copy that was made by the police reporter. I just want to make that clear to the court.

The Court: What copy? Do you mean that's what's already in evidence?

Mr. Boyd: Yes sir, that's the same copy he had yesterday as well as in pre-trial. I want the record to be clear on that, your Honor.

The Court: All right, Mr. Notte, is that correct?

Mr. Notte: Yes, your Honor.

Hence, appellant could have listened to the tape but refused to do so. Clearly, the United States did not try to hide anything. On the contrary, appellant failed to take the United States up on its offer to make the tape available.

Moreover, appellant did not contend that the tape recording in fact contained exculpatory evidence, let alone exculpatory evidence of a material nature. Nor can appellant argue that he could not determine whether the tape contained material exculpatory evidence because he was not given a chance to hear the tape. He had the option of obtaining the tape but did not exercise it. We therefore find Preston's *Brady* claim to be entirely without merit.

### Prejudicial Admission Of Prior Bank Robbery Conviction?

 Appellant challenges the admission of his 1971 bank robbery conviction into evidence for impeachment purposes, claiming that such admission violates Rule 609(a) of the Federal Rules of Evidence,[14] which provides:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

Appellant claims that the Trial Court failed to weigh the prejudicial effect of admitting his prior bank robbery conviction against its probative value. Moreover, he contends that the prejudicial effect of the evidence in fact outweighed its probative value.[15]

Our reading of the record reveals that in admitting Preston's 1971 bank robbery conviction into evidence, the Trial Court made no on-the-record determination that the probative value of the evidence outweighed its prejudicial effect. The Court simply noted, "There's no question about that. It is admissible [for purposes of impeachment] if he takes the stand." Indeed, there is nothing in the record to demonstrate that the Judge even considered Rule 609.

14. Although appellant challenges the admission of the prior conviction in both trials, we fail to see the relevance for purposes of this appeal of what the first Trial Judge did. The United States contended in oral argument that the second Trial Court implicitly adopted the on-the-record Rule 609 findings made by the first Trial Judge. We reject this potentially troublesome doctrine that in retrial a Trial Judge can avoid the requirements of the Federal Rules of Evidence by silently adopting the rulings and on-the-record determinations of the first Trial Judge. We therefore focus solely on what transpired at the second trial.

15. The United States has not attempted to argue that bank robbery involves "dishonesty." Under Rule 609(a)(2), crimes of dishonesty can be used for impeachment purposes without the

need for an explicit finding that the probative value of the evidence outweighs its prejudicial effect. Although certain cases of this Court appear to suggest that bank robbery may in fact be a crime of dishonesty for purposes of Rule 609(a)(2), e. g., *United States v. Carden*, 5 Cir., 1976, 529 F.2d 443, 446, *cert. denied*, 1977, 429 U.S. 848, 97 S.Ct. 134, 50 L.Ed.2d 121 (petty larceny crime of dishonesty under Rule 609(a)(2)), more recent decisions have made clear that this Court takes a very narrow view of "dishonesty" for purposes of Rule 609(a)(2). See, e. g., *United States v. Ashley*, 5 Cir., 1978, 569 F.2d 975, 978–79 (shoplifting not crime of dishonesty under Rule 609(a)(2)). Consequently, admissibility of a prior bank robbery conviction for impeachment purposes requires a Rule 609(a)(1) determination.

We hold today that a Trial Judge must make an on-the-record finding that the probative value of admitting a prior conviction outweighs its prejudicial effect before admitting a non-609(a)(2) prior conviction for impeachment purposes under Rule 609(a)(1). An on-the-record finding that probative value outweighs prejudicial effect is not merely an idle gesture. Such a finding insures that the Judge has at least taken into account the relevant considerations. Of course, such a finding can still be challenged, but such challenge is analyzed under the abuse of discretion standard. See *United States v. Martinez*, 5 Cir., 1977, 555 F.2d 1273, 1276.[16]

Although the Rule does not on its face mandate, we think it useful for Trial Judges to conduct a hearing on-the-record "at which the pertinent factors are explicitly identified and weighed."[17] 3 J. Weinstein, *Evidence* ¶ 609–79 (1975). As the Seventh Circuit observed, "when such a hearing on the record is held and such an explicit finding is made, the appellate court easily will be able to determine whether the Judge followed the strictures of Rule 609 in reaching his decision." *United States v. Mahone*, 7 Cir., 1976, 537 F.2d 922, 929. See generally, Note, Impeachment by Prior Conviction: Adjusting to Federal Rule of Evidence 609, 1979, 64 Cornell L.Rev. 416, 428–31.

It is important to emphasize that evidence of prior convictions is admitted under Rule 609(a)(1) solely for purposes of attacking credibility. "[T]he assumption that a prior conviction demonstrates a propensity on the part of the defendant to have acted on the present occasion in conformity with the criminal character suggested by the previous conviction is impermissible." *United States v. Cohen*, 5 Cir., 1977, 544 F.2d 781, 785. The danger that a jury will think "once a criminal, always a criminal" makes it important that the Trial Judge focus on prejudice as well as probative value.[18]

Despite our belief in the importance of a Trial Court making an on-the-record finding under Rule 609(a)(1) that the probative value of admitting the evidence outweighs its prejudicial effect, the failure to make such a finding does not automatically call for reversal of Preston's conviction. Instead, following a procedure analogous to that used in *United States v. Rivero*, 5 Cir., 1976, 532 F.2d 450, we remand the case for an on-the-record Rule 609(a)(1) determination. If the Trial Court determines that the probative value of admitting the prior conviction outweighed its prejudicial effect, then the conviction will stand affirmed. If the Trial Court determines that the prejudicial effect of admitting the evidence outweighed its probative value, then the question remains whether there is any reasonable possibility that the admission of the

**16.** If Rule 609(a)(1) did not require an on-the-record finding that probative value outweighs prejudicial effect, then the Rule would be superfluous. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *." We read this Rule to *require* exclusion when prejudice outweighs probative value. See *United States v. Spletzer*, 5 Cir., 1976, 535 F.2d 950. We believe that Rule 609 *supplements* Rule 403, or at least emphasizes the Rule 403 policy in connection with prior crimes offered ostensibly to impeach.

**17.** Important factors which Courts have considered include: (1) the kind of crime involved; (2) when the conviction occurred; (3) importance of the witness' testimony to the case; (4) the importance of the credibility of the defendant. See generally Symposium, *The Federal Rules of Evidence*, 1977, 71 Nw.L.Rev. 634, 661–64.

**18.** The risk of prejudice may be particularly high where, as here, the former crime is of the same nature as the one for which defendant is being tried. As then Judge (now Chief Justice) Burger observed:

> [S]trong reasons arise for excluding those [convictions] which are for the same crime because of the inevitable pressure on lay jurors to believe that 'if he did it before he probably did so this time.' As a general guide, those convictions which are for the same crime should be admitted sparingly * * * *.

*Gordon v. United States*, D.C.Cir., 1967, 127 U.S.App.D.C. 343, 347, 383 F.2d 936, 940, *cert. denied*, 1968, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287.

conviction affected the outcome of the case.[19]

We are confident that the Trial Court's determination will cause no great holdup, since the Judge is armed with all of the necessary facts. We cannot mask our concern about the importance of making an on-the-record determination under Rule 609(a)(1). Failure to make such a determination robs a defendant of the Rule's protection. There is no escaping from this fact. On the other hand, we stick up for neither side on the merits. We deposit the record, briefs, and exhibits in the hands of the Trial Court for analysis and safe keeping.

AFFIRMED BUT REMANDED FOR FURTHER PROCEEDINGS.

---

**19.** We declare as the law of this case that an appeal will lie to this Court from a Trial Court decision adverse to Preston. To the extent that the present record is inadequate, the parties may supplement it as the Trial Judge initially determines appropriate. The Trial Court shall file and certify to this Court its findings and conclusions. If the Trial Court's findings are challenged by the appellant, then the appellant need not file a new appeal. Instead, the appellant can lodge with this Court certified copies of the Trial Court's findings plus supplementary briefs and other materials. The matter will be referred back to this same panel.