THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
JESSE PIERCE, Defendant-Appellee.

Fifth District    No. 79-395

Opinion filed September 19, 1980.

HARRISON, J., dissenting.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and Stephen J. Maassen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Patrick M. Young, Public Defender, of Belleville (Ann Hatch, Assistant Public Defender, and Terrance L. Farris, law student, of counsel), for appellee.

Mme JUSTICE SPOMER delivered the opinion of the court:

The State appeals from an order of the circuit court of St. Clair County granting defendant Jesse Pierce's motion to suppress his confession. On appeal the State contends: (1) the exclusionary rule was improperly applied to defendant's confession, as the confession was not the result of prior police misconduct; and (2) the motion to suppress the confession was improperly granted because the search made previous to the confession was proper. For the following reasons, we reverse the order of the circuit court.

On the night of December 31, 1978-January 1, 1979, while on routine patrol, Chief Alvin Sievers of the village of Marissa, Illinois, discovered that the gate to a landfill in Marissa Township in St. Clair County had been knocked down. The landfill was owned by Mr. Bob Brown, and Sievers left a message for Brown that he notify the police if anything was missing. At the time he discovered the damaged gate, Sievers observed the defendant's vehicle traveling up and down Bubble Stream Road, the road which passes the landfill. This road is U-shaped and leads only to the landfill and then back to the city of Marissa.

After he returned to Marissa from the landfill, Sievers stopped defendant's automobile for a technical violation at approximately 2:30 or 3 a.m. on January 1, 1979. Defendant and a passenger, Ronald Miller, occupied the vehicle. They told Sievers they had been to a party in Marissa and were not riding around. Sievers checked defendant's driver's license and then told them to go home since "there had been some damage around town." No search or arrest was made.

At approximately 9 or 10 a.m. Reese Ford, an automobile agency in Marissa, reported to Marissa police that an FM high-band radio had been stolen from a truck parked beside its place of business. That same afternoon the owner of the landfill reported that a utility shed had been broken into and some tools, grease guns and wrenches had been stolen. On January 2, 1979, Mr. Price, who had left his truck at Reese Ford to be repaired, notified police that his vehicle had sustained front-end damage. Automobile parts and tire tracks found near the gate at the landfill matched Price's truck.

By the morning of January 3, 1979, Chief Sievers had collected five reports of thefts which had occurred either the night of December 31, 1978, or the early morning hours of January 1, 1979. He told Trooper Barker of the Illinois State Police that he had stopped defendant's automobile on January 1, 1979, and stated he felt defendant and Ronald Miller might be involved in the burglaries. Sievers and Barker then visited Miller at his home and advised him of his rights. Chief Sievers told Miller he had seen him at the landfill at the approximate time of the crime. Miller then confessed that he and others had stolen the truck from Reese Ford. Miller

named his brother Steven Miller, his cousin Gary Zettler, and defendant, Jesse Pierce, as having taken part in the theft.

Trooper Barker placed Miller under arrest, advised him of his rights and transported him to Marissa. On the way to the police station Miller told Barker and Sievers that he and Zettler had stolen a radio from a vehicle on the Reese Ford lot and that auxiliary driving lights had also been taken. The radio and a fish-finder had been thrown from defendant's automobile in a paper bag on Bubble Stream Road as the Marissa police were approaching. The Marissa police later found these items along the road leading to the landfill at the exact place where Miller said he had thrown them.

Chief Sievers also advised Miller of his rights and took a written statement from him between 10:40 and 11:45 a.m. on January 3, 1979. Miller's statement read as follows:

"Approximately 01:40 hours, January, 1979, I, Ronald J. Miller and my cousin, Gary Zettler, opened the driver's side door of a black Ford Bronco that was parked on the north side of Reese Ford. Upon entering the Bronco, I, Ronald Miller, took a small knife and cut the black power of the two-way radio that was on the floor of the Bronco. Gary Zettler finished cutting the cable with the same knife. I then broke the radio loose, and put it in my coat, and I and Gary Zettler then went to the south side of Reese Ford and took a black and red 1977 Ford, license number 75 4381B, Illinois '79 truck plates, and went to the landfill located on Bubble Stream Road just west of Marissa. I drove this vehicle. Upon arriving at the landfill, my cousin, Gary Zettler, then took over as driver of the vehicle. I then got in Jesse Pierce's car, a green 1974 Ford Torino. Gary Zettler and my brother, Steven Miller, then ran the 1977 Ford Pick-up into the gate at the landfill. Gary Zettler and my brother then went into a field and turned off the vehicle lights. A Marissa car then came by, so Jesse Pierce and me took off south down Bubble Stream Road. Marissa Police stopped us back in Marissa. Gary Zettler and my brother, Steven Miller returned the black Ford, black and red Ford pick-up to Reese Ford. Jesse Pierce and myself picked them up. We went back to my sister's house. Prior to the above-mentioned events, I was at my sister's house sleeping when I was woke up and saw Gary Zettler, Steven Miller, and Jesse Pierce looking at auxiliary lights in the bedroom of my sister's house, Barbara Miller's residence. Barbara Miller, my sister, told Zeller, S. Miller, and J. Pierce to get the lights out of her house, and I took the lights and put them in the trunk of J. Pierce's vehicle. I saw that there was a lot of tools and grease guns in the trunk of Pierce's vehicle. I asked where the tools came—where they came from and which one of them—one of them said they got them from Brown's shed at the

landfill. They said they stole the lights at Reese Ford at approximately 12:00 hours, January 1st. J. Pierce, Gary Zettler then left for their house and had all the stolen items in the trunk of Pierce's vehicle."

Barker then contacted Trooper Leo Sprankle, who came to the Marissa police station with Trooper Ratto. Since defendant lived in Pinckneyville, the officers next went to the State's Attorney's office at the Perry County courthouse in that city, where they were met by Pinckneyville Chief of Police, Tom Denton. They gave Denton all the information obtained up to that point, including the defendant's address and a description of his automobile, a 1974 green Ford Torino. Denton then went to defendant's residence, found the automobile there, and returned to the State's Attorney's office with this information. At that time Chief Sievers applied for a search warrant for defendant's automobile. The State's Attorney's office prepared the complaint, affidavit, and search warrant, which were taken to a judge of the circuit court of Perry County. Sievers signed the documents in the presence of the judge, who then issued the search warrant.

The search warrant was served on defendant, and his automobile was searched late that afternoon. He was not questioned prior to the serving of the warrant. Pursuant to the execution of the search warrant, the auxiliary lights from the vehicle on Reese Ford's lot and grease guns and other tools taken from the Brown Landfill were recovered from the trunk of the automobile, and defendant was placed under arrest at 4:45 p.m. on January 3, 1979, charged with possession of stolen property in Perry County and theft and burglary in St. Clair County.

The stolen items were placed in a State police car, and defendant was transported to the Perry County jail. Trooper Barker advised defendant of his rights, and defendant signed a written waiver at 5:15 p.m. Defendant then gave a statement to Barker, which was written down by the officer from 5:30 to 6:03 p.m. Sievers witnessed defendant's statement. At 6:10 p.m. Chief Denton also advised defendant of his rights, and defendant again signed a written waiver. An hour and 10 minutes later, from 7:20 until 7:55 p.m., defendant gave a statement to Denton. During this interim, defendant remained alone while Denton completed his "paperwork."

The search warrant was subsequently quashed by the issuing judge in the circuit court of Perry County on the ground that the informant's (Ronald Miller's) credibility had not been sufficiently established to support probable cause. The evidence found pursuant to the search warrant also was quashed in Perry County on the ground that it was seized as a result of the illegal search.

On the basis of the Perry County order, the items found in defendant's car were also held to be inadmissible in St. Clair County in the case at bar.

Defendant then moved to suppress the confession in St. Clair County, claiming it was the result of an illegal search.

At the motion hearing in St. Clair County, defendant testified that the officers came to his door and asked if "that was my automobile." He answered in the affirmative, whereupon the officers gave him the search warrant and asked if they could open the trunk. Defendant gave his approval and opened the trunk for them. He further testified that he was then placed under arrest for theft of tools and other items and for burglary, was read his *Miranda* rights, understood them, and waived them voluntarily. After being transported to jail, he made a statement, which was written down by one of the officers, and he read and signed it. He testified that the statement was true, he was not threatened, coerced, or intimidated in any manner, or forced to sign it. Defendant said he gave Trooper Barker the statement because, "Well, I figured they seen the stuff in my car, so I figured they had me. I just went ahead and gave them the statement." Afterward Chief Denton came in and asked defendant if he would give him a statement, defendant answering, "Yessir, I would." Prior to this statement, Denton again read defendant the *Miranda* warnings, and he signed a written waiver of rights. When asked why he gave his statement to Denton, defendant responded, "I figured since I gave the State Troopers one, I would just go ahead and give Mr. Denton one too, then I gave one because I done gave one." He admitted that this was his own conclusion and that the police created no atmosphere which led him to confess.

In the argument on the motion to suppress in the trial court, defendant's counsel stated:

> "I am not arguing, and I am not asserting that the defendant's statements were given as a result of his illegal arrest. Our contention is * * * defendant's statements were taken by exploitation of the prior illegal search. We are not arguing illegal arrest.
>
> * * *
>
> We readily admit in this case there was no flagrant misconduct, I can't sit here and tell you, Judge, that the police were wrong, because they did handle it right. We admit they handled it right. The problem was a search warrant is later shown by Judge Bastien was not sufficient, and the Judge quashed that search warrant, but they did—the police did do what they should have done."

The trial court granted the motion to suppress after finding that "defendant's statements would not have been made had not the unlawful search of the defendant's car been conducted exposing the items which had been stolen during the theft in question. * * *" He also found that proper *Miranda* warnings had been given and that "the primary illegality does not amount to flagrant misconduct."

The first issue which we must consider is whether the search of

defendant's automobile was proper despite the Perry County Circuit Court's order quashing the search warrant. The State contends that Miller's confession, being an admission against penal interest, was sufficient to establish probable cause. No issue is raised as to validity of the search warrant itself, as the doctrine of collateral estoppel (*People v. Hopkins* (1972), 52 Ill. 2d 1, 4, 284 N.E.2d 283, 284) precluded the trial court in St. Clair County, and precludes us, from addressing that issue.

■■ The totality of the circumstances presented to the investigating officers at the time of the search must be considered to determine whether a warrantless search was justified (*People v. Blitz* (1977), 68 Ill. 2d 287, 369 N.E.2d 1238; *People v. Blackman* (1978), 62 Ill. App. 3d 726, 379 N.E.2d 344). If it was otherwise justified, the legitimacy or scope of the search warrant used by police is immaterial. (*People v. George* (1971), 49 Ill. 2d 372, 274 N.E.2d 26.) Similarly, where probable cause for a warrantless arrest existed, the arrest is not invalidated because made pursuant to a warrant later found to be invalid. (*Giordenello v. United States* (1958), 357 U.S. 480, 488, 2 L. Ed. 2d 1503, 1510-11, 78 S. Ct. 1245, 1251; *United States v. Rabinowitz* (1950), 339 U.S. 56, 60, 94 L. Ed. 2d 653, 657, 70 S. Ct. 430, 432.) Viewing the instant case in the light of these decisions, we think that the officers had sufficient justification for the search of defendant's automobile and for defendant's arrest. During the early morning hours Chief Sievers found the gate to Brown's landfill damaged and out of place, and at the same time he noticed defendant's vehicle traveling back and forth on the landfill road. This road led only to the remote area of the Brown property. When the officer stopped the vehicle for a technical violation, he found that defendant was driving and Ronald Miller was a passenger. Later that night the officer was advised that five thefts had occurred in the area, and he had reason to believe defendant and Miller were involved. When Sievers talked with Miller and read the *Miranda* warnings to him, Miller confessed and implicated defendant. Miller's confession was corroborated by the finding of the physical evidence at the exact location along landfill road where Miller said he had thrown it from the car when the police were approaching. Miller had described defendant's car and its location at defendant's home address, 907 Taffee Street in Pinckneyville. The officer relayed this information to Chief Denton in Pinckneyville, who verified that a car of that description was located at the address given. We think the detailed accusation of Miller—itself a declaration against his penal interest—together with these corroborating facts personally known to the officers, was sufficient to form a basis for a reasonable belief that certain crimes had been committed by the defendant (*United States v. Harris* (1971), 403 U.S. 573, 29 L. Ed. 2d 723, 91 S. Ct. 2075.) In *Harris* the court explained why admissions of crime are credible:

"People do not lightly admit a crime and place critical evidence in

the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." 403 U.S. 573, 583, 29 L. Ed. 2d 723, 734, 91 S. Ct. 2075, 2082.)

Thus the search and arrest were valid, irrespective and independent of the finding by the Perry County Circuit Court that the search warrant was invalid.

The second issue raised by the State is that the exclusionary rule was improperly applied to the defendant's confession because (1) the trial court imposed it pursuant to an improper "but for" test; (2) the police committed no misconduct which could be deterred by its application; and (3) the confession was not the result of police exploitation of an improper search.

The exclusionary rule was judicially created to prevent the use of evidence in a criminal prosecution secured through an illegal search and seizure in violation of the defendant's fourth amendment rights (*Weeks v. United States* (1914), 232 U.S. 383, 391-93, 58 L. Ed. 652, 655, 34 S. Ct. 341), and was originally held to be applicable only to the Federal Government and its agencies. The court refused to extend the rule to the prosecution in a State court for a State crime in 1949 (*Wolf v. Colorado* (1949), 338 U.S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359), but in 1961 that position was reversed. *Mapp v. Ohio* (1961), 367 U.S. 643, 660, 6 L. Ed. 2d 1081, 1093, 81 S. Ct. 1684, 1694.

Although the earlier cases held that the purpose of the exclusionary rule was to deter police conduct that violates fourth amendment rights as well as to preserve judicial integrity by removing any appearance of approval of such misconduct (*Harrison v. United States* (1968), 392 U.S. 219, 224 n.10, 20 L. Ed. 2d 1047, 1052 n.10, 88 S. Ct. 2008, 2011 n.10; *Elkins v. United States* (1960), 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444), in the case of *Stone v. Powell* (1976), 428 U.S. 465, 49 L. Ed. 2d 1067, 96 S. Ct. 3037, the Supreme Court clearly asserted that the primary justification for the rule is deterrence of police misconduct. In refusing to extend the rule to collateral review in Federal habeas corpus cases involving State cases in which the seized evidence was permitted to be introduced, the court said:

"Post-*Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search and seizure, for any '[r]eparation comes too late.' [Citation.] Instead, 'the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect * * *.' [Citations.]

* * * But despite the broad deterrent purpose of the exclusionary rule, it has never been interpreted to proscribe the introduction of

illegally seized evidence in all proceedings or against all persons."
*Stone*, 428 U.S. 465, 486, 49 L. Ed. 1067, 1083, 96 S. Ct. 3037, 3048.

The court noted that when the exclusionary rule is applied the focus of the trial and the attention of the participants therein are directed from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Furthermore, the physical evidence excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. *Stone*, 428 U.S. 465, 490, 49 L. Ed. 2d 1067, 1085, 96 S. Ct. 3037, 3080.

An exhaustive analysis of the exclusionary rule was made in the very recent case of *United States v. Williams* (5th Cir. 1980), 27 Crim. L. Rep. 3293, where the court sitting *en banc* held that henceforth in that circuit, evidence obtained by police conduct that is alleged to be unlawful shall not be suppressed if the government establishes that the conduct, if mistaken or unauthorized, was taken in the reasonable good-faith belief that it was proper, reasoning that:

> "We do so because the exclusionary rule exists to deter willful or flagrant actions by police, not reasonable, good-faith ones. Where the reason for the rule ceases, its application must cease also. The costs to society of applying the rule beyond the purposes it exists to serve are simply too high—in this instance the release on the public of a recidivist drug smuggler—with few or no offsetting benefits. We are persuaded that both reason and authority support this conclusion." (27 Crim. L. Rep. 3297.)

The court emphasized that the exclusionary rule is not itself a requirement of the Constitution, but is a "judge-made rule crafted to enforce constitutional requirements, justified in the illegal search context only by its deterrence of future police misconduct," and continued:

> "It makes no sense to speak of deterring police officers who acted in the good-faith belief that their conduct was *legal* by suppressing evidence derived from such actions unless we somehow wish to deter them from acting at all." 27 Crim. L. Rep. 3298.

Nor does the rule extend to grand jury proceedings (*United States v. Calandra* (1974), 414 U.S. 338, 347, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 619) nor require the exclusion of evidence for impeachment purposes (*Walder v. United States* (1954), 347 U.S. 62, 98 L. Ed. 2d 503, 74 S. Ct. 354), as there must be a balancing process between the defendant's rights under the fourth amendment and the public's interest "in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman v. United States* (1969), 394 U.S. 165, 174-75, 22 L. Ed. 2d 176, 187, 89 S. Ct. 961, 967.

The exclusionary rule has been extended to the indirect physical

products of these unlawful invasions (*Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182) as well as to verbal evidence (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407). In *Wong Sun* the court said:

> "[W]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be urged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." *Wong Sun* 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.

In the instant case, assuming that the police violated the fourth and fourteenth amendments by use of an invalid search warrant, exclusion of defendant's admissions would not be necessary unless his statements were the result of the invalid search. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) Since both parties cite *Brown* to sustain their argument on this issue, a recitation of the facts of that case is important. Brown was on his way home at 7:45 on the night in question and was climbing the last of the stairs leading to the rear entrance of his apartment in Chicago. He glanced at a window near the door and saw a man pointing a revolver at him from inside his apartment. The man said, "Don't move, you are under arrest." Another man with drawn gun came up behind Brown and repeated the statement that he was under arrest. The men, at gunpoint, ordered him back into the apartment, where a third man also appeared. It later developed that the three men were detectives who broke into the apartment, searched it, and arrested Brown, all without probable cause and without any warrant. They later testified that they made the arrest for the "purpose of questioning Brown as part of their investigation" of a murder committed a week earlier, having learned of Brown's name from the victim's brother as an "acquaintance" of the victim and not as a suspect. Following the arrest, police took Brown to an interrogation room and warned him of his *Miranda* rights. Following questioning, during which they told him they had damaging evidence against him, Brown gave police a statement confessing his complicity in the murder, and later, after additional *Miranda* warnings, he gave a second statement. His motion to suppress both statements prior to trial were denied. After a finding of guilty, Brown appealed. The Illinois Supreme Court held the arrest unlawful for lack of probable cause. However, it held the statements were admissible because the giving of the *Miranda* warnings *per se* served to break the causal connection between the illegal arrest and the giving of the statement, thus defendant's act in confessing was sufficiently an act of free

will to purge the primary taint of the unlawful invasion. On appeal, the United States Supreme Court reversed, holding that defendant's statements were inadmissible because of his illegal arrest, and they were not made admissible *solely* by the giving of *Miranda* warnings under the facts of that particular case. Stating that each case must be determined on its own facts, the court announced these factors to be considered:

> "The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and confession, the presence of intervening circumstances [citation], *and, particularly, the purpose and flagrancy of the. official misconduct* are all relevant." (Emphasis added.) (*Brown*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.)

The court noted that the purpose behind application of the exclusionary rule was to deter future police misconduct:

> "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, *regardless of how wanton and purposeful the Fourth Amendment violation,* the effect of the exclusionary rule would be substantially diluted. (Citation.) Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." (Emphasis added.) (*Brown*, 422 U.S. 590, 602-03, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261.)

Thus, the court concluded that *Miranda* warnings do not provide a *per se* "cure-all" for all constitutional violations; at the same time, it warned that the fact that a confession would not have been given "but for" the prior illegality is not determinative.

The court then noted the "quality of purposefulness" of the illegality in the case before it and emphasized the limited nature of its holding:

> "The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' (Citation.) The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.
> We emphasize that our holding is a limited one. We decide only

that the Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest." *Brown*, 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262-63.

Mr. Justice White concurred in the judgment as follows:

"Insofar as the Court holds (1) that despite *Miranda* warnings the Fourth and Fourteenth Amendments require the exclusion from evidence of statements obtained as the fruit of an arrest *which the arresting officers knew or should have known was without probable cause and unconstitutional*, and (2) that the statements obtained in this case were in this category, I am in agreement and therefore concur in the judgment." (Emphasis added.) *Brown*, 422 U.S. 590, 607, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2263.)

Justice Powell, with whom Justice Rehnquist joined, was unable to conclude that the record was sufficiently complete to justify outright reversal, so he concurred only in part. He agreed with the majority in principal, and elaborated on the general factors considered by the majority as follows:

"The Court's rejection in *Wong Sun* of a 'but for' test, reaffirmed today, * * * recognizes that in some circumstances strict adherence to the Fourth Amendment exclusionary rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes. The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost. Application of the *Wong Sun* doctrine will generate fact-specific cases bearing distinct differences as well as similarities, and the question of attenuation inevitably is largely a matter of degree. The Court today identifies the general factors that the trial court must consider in making this determination. I think it appropriate, however, to attempt to articulate the possible relationships of those factors in particular, broad categories of cases.

* * *

Those most readily identifiable are on the extremes: the flagrantly abusive violation of Fourth Amendment rights, on the one hand, and 'technical' Fourth Amendment violations, on the other. In my view, these extremes call for significantly different judicial responses.

I would require the clearest indication of attenuation in cases in which official conduct was flagrantly abusive of Fourth Amendment rights.

* * *

At the opposite end of the spectrum lie 'technical' violations of

Fourth Amendment rights where, for example, officers in good faith arrest an individual in reliance on a warrant later invalidated or pursuant to a statute that subsequently is declared unconstitutional, see *United States v. Kilgen*, 445 F.2 287 (CA5 1971). As we noted in *Michigan v. Tucker* (417 U.S. 433, 447, 94 S. Ct. 2357, 2365, 41 L. Ed. 2d 182 (1974):

> 'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right.'

In cases in which this underlying premise is lacking, the deterrence rationale of the exclusionary rule does not obtain, and I can see no legitimate justification for depriving the prosecution of reliable and probative evidence. Thus, with the exception of statements given in the immediate circumstances of the illegal arrest—a constraint I think is imposed by existing exclusionary-rule law—I would not require more than proof that effective *Miranda* warnings were given and that the ensuing statement was voluntary in the Fifth Amendment sense." *Brown*, 422 U.S. 590, 608-12, 45 L. Ed. 2d 416, 430-32, 95 S. Ct. 2254, 2264-66.

The majority in *Brown* concluded that the police illegality involved was both flagrant and purposeful, and it therefore emphasized the causal relationship between the illegality and Brown's confessions. A careful review of the majority opinion makes it clear, however, that had the illegality been merely technical, the majority would have applied its general standards much as Justice Powell did in his concurrence. The majority emphasized that the "purpose and flagrancy of the official misconduct"—which has nothing to do with the causal relationship between the illegality and the confession—was the primary factor they considered. In its final paragraph, the majority limited its holding, deciding only that *Miranda* warnings, by themselves, do not *always* purge the taint of an illegality. It thus left open the possibility that *Miranda* warnings, by themselves, may under some circumstances be sufficient to purge the taint—depending on "how wanton and purposeful the Fourth Amendment violation." (*Brown*, 422 U.S. 590, 602, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261.) Further, in enumerating the "purpose and flagrancy of the official misconduct" as a factor, the majority cited *Kilgen* with approval, the same case cited in Justice Powell's concurrence. *Kilgen* concluded that a confession obtained following an arrest for violation of an ordinance later found to be unconstitutional was admissible, because the arrest was not the type of illegality deterred by the exclusionary rule. *United States v. Kilgen* (5th Cir. 1971), 445 F.2d 287, 289.

While a "purely technical" violation has not often been directly dealt with by the Supreme Court, the application of factors cited in *Brown* by the Federal circuit courts and in a recent Supreme Court case makes clear the trend. In *United States v. O'Looney* (9th Cir. 1976), 544 F.2d 385, *cert. denied* (1976), 429 U.S. 1023, 50 L. Ed. 2d 625, 97 S. Ct. 642, defendant made a confession while in custody following a questionable detention. The court found that regardless of the technical illegality of the detention, it did not justify exclusion of the confession:

> "Finally, even if there were an illegal detention, the statement need not be suppressed. *Brown v. Illinois, supra*, relied upon by O'Looney, held that the giving of *Miranda* warnings did not sufficiently attenuate the taint of an illegal arrest so as to render ensuing inculpatory statements admissible. But *Brown* does not purport to establish a *per se* rule that any statement following an illegal arrest is tainted. * * *
>
> Examining each of (the factors enunciated in *Brown*), we conclude that O'Looney's statement is not tainted by the seizure of his person, even if we assume it was illegally accomplished. The Supreme Court in *Brown* placed the greatest emphasis on the flagrancy of the Fourth Amendment violation. There, the police broke into and searched the defendant's apartment without a warrant. Upon the defendant's return home, he was arrested at gunpoint, also without a warrant. The police had no more basis for these acts than that the defendant was an acquaintance of a murder victim. *Id.* at 592-93, 95 S. Ct. 2254. Here, at the very least, the police had a well-founded reasonable suspicion approaching probable cause to believe that O'Looney had committed a crime. There were neither drawn guns nor police actions calculated to cause surprise, fear and confusion. The detention was no more extensive than reasonably necessary to facilitate a brief inquiry into an apparent crime. Thus we need not be concerned with deterring purposefully illegal arrests for investigatory or other improper motives. *Id.* at 599-600, 95 S. Ct. 2254, *id.* at 610-12, 95 S. Ct. 2254 (Powell, J., concurring in part.).
>
> In comparison with *Brown*, the detention of O'Looney was at worst a minor violation of the Fourth Amendment. It was relatively nonintrusive on his personal privacy. He was originally detained on a public sidewalk and he voluntarily cooperated with officers in an effort to allay police suspicion, unlike the forcible seizure of Brown by surprise at his home. Where the Fourth Amendment violation is less flagrant, a lesser showing is required to purge the later statement of taint. Here we hold that O'Looney's statement following the giving of *Miranda* warnings several hours after the initial detention

was sufficiently an act of free will outside the causal chain of the alleged illegal detention. To hold otherwise would be to invoke the Fourth Amendment exclusionary rule for a de minimis deterrent effect on errant police behavior, at a great cost to the legitimate demands of law enforcement." *O'Looney*, 544 F.2d 385, 390-91.

These factors delineated in *Brown* were applied similarly in *United States v. Preston* (5th Cir. 1979), 608 F.2d 626, where the court followed *Brown* and *Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839-40, 99 S. Ct. 2248, 2259, in emphasizing that the most important consideration in determining whether a confession stemmed from exploitation of the illegal arrest is the nature of the police misconduct. (*Preston*, 608 F.2d 626, 634.) Further, the factor of "temporal proximity" cannot be considered in isolation. *Preston*, 608 F.2d 626, 634.

Most tellingly, the *Brown* factors were applied to a recent case of illegal detention in *Rawlings v. Kentucky* (1980), 448 U.S. ___, 65 L. Ed. 2d 633, 100 S. Ct. 2556. In *Rawlings* six police officers went to the home of Lawrence Marquess with a warrant for his arrest on drug distribution charges. In the house at the time they arrived were four visitors, including Vanessa Cox and the petitioner Rawlings. The police searched the house for Marquess, but were unable to find him. However, they smelled marijuana smoke and saw marijuana seeds in plain view in one of the rooms. Two of the officers then left to obtain a search warrant, and the other four detained the occupants in the living room, allowing them to leave only if they consented to a body search. Cox and Rawlings did not consent to a search and remained seated on a couch with Cox's purse in the space between them. The other officers returned with the search warrant which was read, along with *Miranda* warnings, to petitioner and Cox. Cox, as directed, then emptied the contents of her purse on the coffee table, and among the contents was a large amount of controlled substances. Cox immediately told petitioner to "take what was his," whereupon he claimed ownership of all the drugs. Petitioner was then searched, and $4500 in cash was found in his shirt pocket and a knife in a sheath at his side. He was at that time placed under arrest. After indictment for possession with intent to sell controlled substances, petitioner's motion to suppress the physical evidence and the statements was denied. On appeal the United States Supreme Court affirmed. Rawlings contended that his admission of ownership of the drugs was the fruit of an illegal detention that occurred when the police refused to let him leave the house unless he consented to a search. The court agreed that the detention was illegal and violated his fourth and fourteenth amendment rights, but repeated again that the *Brown* inquiry must be made to determine whether the exclusionary rule will be applied. The court noted that the short period of 45 minutes

between the arrest and confession was outweighed by the congenial atmosphere prevailing during the detention period and the lack of a show of force or violence by those present. Furthermore, it emphasized that the conduct of the police was not a *"conscious or flagrant misconduct* requiring prophylactic exclusion of petitioner's statements," in contrast with *Brown.* (Emphasis added.) *Rawlings*, 448 U.S. ___, ___, 65 L. Ed. 2d 633, 645, 100 S. Ct. 2556, 2564.

The court in *Rawlings* also held that the search of petitioner's person was legal as incident to his formal arrest, although the arrest *followed* the challenged search:

> "Once petitioner admitted ownership of the sizable quantity of the drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest. Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice-versa. See *Bailey v. United States*, 128 U.S. App. D.C. 354, 389 F.2d 305, 308 (1967); *United States v. Brown*, 150 U.S. App. D.C. 113, 463 F.2d 949, 950 (1972). See also *Cupp v. Murphy*, 412 U.S. 291, 36 L. Ed. 2d 900, 93 S. Ct. 2000 (1973); *United States v. Gorman*, 355 F.2d 151, 160 (C.A.2 1965) (dictum), cert. denied, 384 U.S. 1024, 16 L. Ed. 2d 1027, 86 S. Ct. 1962 (1966)." 448 U.S. ___, ___, 65 L. Ed. 2d 633, 645-46, 100 S. Ct. 2256, 2565.

■■ The conclusion from the preceding cases is that the purpose and flagrancy of the police misconduct are premier in any analysis, and that this factor may alter or even supersede any causal or temporal proximity conclusions which might otherwise be made. This is in accord with the rejection in *Brown* and *Wong Sun* of any "but for" analysis.

These cases make it clear that the facts which distinguish the instant case from *Brown* justify, even require, a different result. The primary factor—conscious or flagrant misconduct—is totally absent. When police sought to search defendant's automobile trunk, they requested a search warrant through the proper legal channels, undeniably armed with probable cause for the search. They knew exactly what crime had occurred and when it took place. They knew what had been stolen and had already recovered those stolen items which had been discarded by the burglars. They knew the names of each of the burglars, including defendant. They knew the location and description of defendant's car and had been told what was in the trunk by the very man who had placed some of the stolen items there. All of this information was conveyed to police through a self-authenticating confession by one of defendant's accomplices, and through their own observations. When police requested the search warrant,

they had virtually passed the stage of investigation of the burglary and had reached the stage of recovering the stolen property, taking into custody those individuals they had probable cause to believe were the burglars, and garnering evidence for prosecution. There is no element of the exploratory "fishing expedition" misconduct contained in *Brown*. The conduct of the police at the time of the search and arrest clearly did not create "surprise, fright and confusion." Chief Sievers testified that when the officers went to defendant's house, defendant's mother "wanted to know what we were doing there, and what the search warrant was for, * * * we informed her." We explained to her "what the procedure was, what we were doing." When the officers first arrived at defendant's house, "* * *Jesse came out and I asked him, I said do you remembered [*sic*] me, and he said, yes I do, and I said, Well, I stopped you the night in Marissa. We have a search warrant for your vehicle." Defendant then produced his car keys upon request of the officer. Obviously, a congenial atmosphere prevailed, and it was within this frame that the *Miranda* warnings were given and the statements made, with no show of force, threats, or deceit, defendant himself testifying to this fact. The illegality was neither wanton nor flagrant. Defense counsel even admitted this, concluding that "the police did handle it right * * * did do what they should have done."

Under the totality of circumstances present, including the fact that the extent of the police misconduct was at most minimal and not conscious or flagrant; that the police had sufficient evidence which was legally obtained to provide an independent basis for the discovery of the challenged evidence; that the admittedly valid arrest occurred immediately after the search; that the stolen items were excluded from evidence; that *Miranda* warnings were given; and that the threshold requirement of voluntariness of defendant's statements and their truth were admitted by defendant,[1] we find that the State has carried its burden of showing that defendant's statements were acts of free will unaffected by a search with an invalid search warrant (assuming *arguendo* its invalidity) and that any taint was removed or purged from his statements. Furthermore, we think the test set forth in *United States v. Williams* of "reasonable and good-faith belief by the police in the propriety of their conduct" was met by the State, and in fact was unquestioned by the defendant. Strict adherence to the fourth amendment exclusionary rule on these facts would be a cost far outweighing any deterrence of the type of illegality committed by these officers, where not only is the violation merely "technical" as noted by Justice Powell's concurrence in *Brown*, but the officers did in fact have probable

---

[1] At the suppression hearing defendant admitted that he knew his *Miranda* rights, had waived them voluntarily, was neither coerced nor promised leniency, and admitted that his statements to the police were true.

cause for their actions. For these reasons we reverse the order of the trial court and remand for further proceedings not inconsistent with this opinion.

Reversed and remanded.

KASSERMAN, J., concurs.

Mr. JUSTICE HARRISON, dissenting:
I dissent.
The majority first holds that the search of defendant's car was legal notwithstanding the fact that the search warrant wàs quashed and all physical items seized pursuant thereto were suppressed. Since these rulings were never appealed by the State, I do not believe the search is now subject to review under the constraints of *People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283, and *People v. Taylor* (1971), 50 Ill. 2d 136, 277 N.E.2d 878. The majority improperly limits the collateral estoppel effects of the Perry County Circuit Court's rulings to the "validity of the search warrant itself."

The majority thereafter sets forth all of the information the police had in order to conclude that there was a sufficient basis "for a reasonable belief that certain crimes had been committed by the defendant." I submit that at most this gave the police probable cause to arrest defendant. This information does not support the finding that the search was valid, especially since the Perry County court found otherwise. That court found informant Miller unreliable and his information, in conjunction with that of the police, insufficient to support a finding of probable cause to search. Moreover, there is no indication anywhere in the record that Miller's confession was submitted as part of the police's application for the warrant. Thus it cannot be stated, as does the majority, that Miller's "statement against penal interest" was sufficient to support a finding of probable cause to search, especially where the Perry County court did so find. Therefore, the majority's contention that the police were "undeniably" armed with probable cause for the search is not valid. Nowhere does the majority attempt to justify the search under one of the well-known doctrines such as search incident to arrest, plain view search, or search pursuant to the so-called "automobile exception" to the constitutional requirement of a warrant. And I have difficulty in reconciling the majority's holding with that of the famous parked car case of *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022. Nonetheless, since the warrant was invalid and the search improper, I submit the only remaining points to be resolved are whether the confessions were the fruit of the illegal search and whether they should have been suppressed under the exclusionary rule. Again, the majority errs on both counts.

The exclusionary rule is a judicially created remedy used to secure one's fourth amendment right to be free from illegal search and seizure. The source of this rule was *Weeks v. United States* (1914), 232 U.S. 383, 391-93, 58 L. Ed. 652, 655-56, 34 S. Ct. 341, 344:

> "The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.
>
> * * *
>
> * * * If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

The court found that the evidence at issue had been illegally seized in direct violation of the constitutional rights of the accused and thus should have been returned to the defendant and not used at his trial. The exclusion of the evidence was found to be an implied requirement of the fourth amendment. This limitation on the use of illegally seized evidence, however, was held only to apply to the Federal Government and its agencies.

The exclusionary rule took on a deterrent theme in the case of *Wolf v. Colorado* (1949), 338 U.S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359, which acknowledged that the exclusion of illegally seized evidence might provide a vehicle for discouraging unreasonable police conduct. However, relying on the State's contention that such conduct by the police was too slight to

necessitate such a deterrent remedy and on the general proposition that the public opinion of the local community would more effectively deter illegal police action, the court held that the exclusionary rule did not apply to the States. In 1961, however, the use of evidence at State trials that would be excluded at Federal trials was found to be illogical and the exclusionary rule was applied to the States via the fourteenth amendment. (*Mapp v. Ohio* (1961), 367 U.S. 643, 660, 6 L. Ed. 2d 1081, 1093, 81 S. Ct. 1684, 1694.) At this time the court restated that the purpose of the exclusionary rule " 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " (*Mapp v. Ohio*, 367 U.S. 643, 656, 6 L. Ed. 2d 1081, 1090, 81 S. Ct. 1684, 1692, citing *Elkins v. United States* (1960), 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444.) Evidence resulting from an illegal search and seizure was, therefore, held inadmissible against the accused at either a State or Federal trial.

It is clear, then, that the rationale of the exclusionary rule is primarily the deterrence of unlawful police conduct. (*Wolf v. Colorado*; *Elkins v. United States* (1960), 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444.) To a lesser extent, the rule is also designed to protect the integrity of the courts by removing what would appear to be a judicial imprimatur of unlawful government conduct. (*Harrison v. United States* (1968), 392 U.S. 219, 224 n.10, 20 L. Ed. 2d 1047, 1052 n.10, 88 S. Ct. 2008, 2011 n.10; *Elkins v. United States* (1960), 364 U.S. 206, 222-23, 4 L. Ed. 2d 1669, 1680-81, 80 S. Ct. 1437, 1446-47.) However, the Supreme Court has as of late resorted to emphasis of the deterrent rationale alone. *Stone v. Powell* (1976), 428 U.S. 465, 49 L. Ed. 2d 1067, 96 S. Ct. 3037; *United States v. Calandra* (1974), 414 U.S. 338, 38 L. Ed. 2d 561, 94 S. Ct. 613.

Since the exclusionary rule was first propounded, the Supreme Court has both broadened and narrowed the rule to meet the challenges of a changing society and legal environment. One such expansion encompassed evidence tainted by an illegal search and seizure.

> "The exclusionary rule applies not only to items obtained in an illegal search or seizure, but also to any derivative evidence which is discovered based upon the knowledge gained by the police through the illegal police conduct. This derivative evidence has been dubbed the 'fruit of the poisonous tree.' The primary evidence which was obtained in the search is the poisonous tree, and the derivative evidence its fruit." (W. Ringel, Searches & Seizures, Arrests and Confessions §3.2, at 3-3 (2d ed. 1979) (hereinafter cited as Ringel).)

Hence primary evidence which results from unlawful police action is automatically subject to suppression, while derivative or secondary evidence is suppressed if it is tainted because it was obtained by "exploitation"

of the primary illegality. *Alderman v. United States* (1969), 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

The "fruit of the poisonous tree" doctrine, so named in *Nardone v. United States* (1939), 308 U.S. 338, 341, 84 L. Ed. 307, 312, 60 S. Ct. 266, was first espoused in the case of *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182. In that case, the government, after an illegal search which resulted in the seizure of books, papers and documents from the defendant, returned the material to the corporation, but only after the government had obtained sufficient information from that material to frame a new indictment and obtain subpoenas to reseize some of the same records. The court held that evidence either directly or indirectly obtained as the result of an illegal search could not be used by the government, lest the fourth amendment be rendered to the status of "mere words."

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred or inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." 251 U.S. 385, 392, 64 L. Ed. 319, 321, 40 S. Ct. 182.

Although the exclusionary rule in *Silverthorne* was applied only to physical, tangible evidence which was the "fruit" of an illegal search, the Supreme Court in *Wong Sun v. United States* applied the rule to verbal evidence similarly obtained. The court found there was no difference between verbal and physical evidence when the purpose of the exclusionary rule was considered.

> "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. [Citation.] Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, [citation]; or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, [citation], the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction." 371 U.S. 471, 485-86, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416.

While the exclusionary rule has thus been extended to apply to physical and verbal evidence derived from the primary illegal search and sei-

zure, certain limitations have been placed on its application. The Supreme Court in *Wong Sun* has recognized that

> "[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." (371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.)

The Supreme Court has consistently applied the *Wong Sun* exploitation test as of late in determining whether exclusion of evidence in that particular case would promote the main deterrent purpose of the exclusionary rule. *United States v. Ceccolini* (1978), 435 U.S. 268, 275, 55 L. Ed. 2d 268, 276, 98 S. Ct. 1054, 1059-60; *Brown v. Illinois* (1975), 422 U.S. 590, 599, 45 L. Ed. 2d 416, 424-25, 95 S. Ct. 2254, 2259; *United States v. Calandra* (1974), 414 U.S. 338, 347, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 619.

Accordingly, the Supreme Court has recognized certain situations where the prosecuting authorities can convince the court that the taint of an illegal search or arrest has been removed or purged from the secondary evidence or fruit because it was not obtained by exploitation of the primary illegality. One of these situations is the so-called "independent source" rule which was first set forth in *Silverthorne* as quoted above. This rule holds that where evidence which was legally obtained in fact provided an independent basis for the disclosure of the challenged evidence, it can be said the taint of police misconduct has been removed from the alleged fruit. (*United States v. Bacall* (9th Cir. 1971), 443 F.2d 1050, 1956, *cert. denied* (1971), 404 U.S. 1004, 30 L. Ed. 2d 557, 92 S. Ct. 565; *United States v. Holsey* (10th Cir. 1970), 437 F.2d 250, 253; *United States v. Schipani* (2d Cir. 1969), 414 F.2d 1262, 1266, *cert. denied* (1970), 397 U.S. 922, 25 L. Ed. 2d 102, 90 S. Ct. 902.) Some courts have interpreted the rule to mean that the government must show the discovery of the challenged evidence was in no way connected with the primary illegality. *United States v. Castellana* (5th Cir. 1974), 488 F.2d 65, 67-68, *aff'd in part*, 500 F.2d 325; *United States v. Resnick* (5th Cir. 1973), 483 F.2d 354, 357, *cert. denied* (1973), 414 U.S. 1008, 38 L. Ed. 246, 94 S. Ct. 370; *United States v. Barrow* (3d Cir. 1966), 363 F.2d 62, 66, *cert. denied* (1967), 385 U.S. 1001, 17 L. Ed. 2d 541, 87 S. Ct. 703; *United States v. Schipani.*

> "Other courts have more broadly construed the independent source exception to admit evidence when some prior lead existed which may have led to discovery of the challenged evidence, even

though an illegal search provided the same information and the evidence was not secured until after the information was received through the illegal search." (Ringel, §3.3(a), at 3—13.)

*E.g., United States v. Brock* (9th Cir. 1978), 571 F.2d 480, 484; *United States v. Sor-Lokken* (10th Cir. 1977), 557 F.2d 755, 758, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 274; *United States v. DeMarce* (8th Cir. 1975), 513 F.2d 755, 758; *United States v. Bacall.*) Notwithstanding these various interpretations of the independent source rule, it still stands as one method for proving that the subject evidence is free from the taint of an illegal search.

Another such method for disproving the causal connection between the illegal search and alleged fruit is the attenuation doctrine, whereby the government shows that the connection has "become so attenuated as to dissipate the taint'." (*Wong Sun v. United States* (1963), 371 U.S. 471, 487, L. Ed. 2d 441, 455, 83 S. Ct. 407, 417; *Nardone v. United States* (1939), 308 U.S. 338, 341, 84 L. Ed. 307, 312, 60 S. Ct. 266. This approach resulted from an application of good sense, because the proper "[s]ophisticated argument" could always prove a causal connection. Hence, the Supreme Court has established certain considerations to be made in determining whether there has been sufficient attenuation to purge the taint of unlawful conduct. In *Brown v. Illinois*, the Supreme Court synthesized these factors, even though that case involved illegal arrest rather than search and later confession.

> "The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, [citation], and, particularly, the purpose and flagrancy of the official misconduct are all relevent. [Citation.]" (422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.)

All of these factors have been applied in light of the deterrent policy underlying the exclusionary rule. (*Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421; *United States v. Ceccolini; Stone v. Powell.*) This factor-policy analysis is now commonplace by virtue of the plethora of cases which inundate the case books.

Still a third exception to the exclusionary rule as it relates to secondary or derivative evidence is the so-called "inevitable discovery" rule, which

allows the government to show that the challenged evidence would have been inevitably obtained by legal means. (*Government of Virgin Islands v. Gereau* (3d Cir. 1974), 502 F. 2d 914, 927-28, *cert. denied* (1975), 420 U.S. 909, 42 L. Ed. 2d 839, 95 S. Ct. 829; *Wayne v. United States* (D.C. Cir. 1963), 318 F. 2d 205, 209, *cert. denied* (1963), 375 U.S. 860, 11 L. Ed. 2d 86, 84 S. Ct. 125.) This rule, which works under the assumption that the subject evidence would have been discovered via diligent police work, has never been directly ruled on by the Supreme Court, although it was referred to favorably in dictim in *Brewer v. Williams* (1977), 430 U.S. 387, 406 n.12, 51 L. Ed. 2d 424, 441 n.12, 97 S. Ct. 1232, 1243 n.12. The focus of the rule is whether normal police procedures would have uncovered the evidence without the llegality. (*Government of Virgin Islands v. Gereau*; *United States v. Falley* (2d Cir. 1973), 489 F.2d 33, 40; *United States v. Evans* (8th Cir. 1972), 454 F.2d 813, 819, *cert. denied* (1972), 406 U.S. 969, 32 L. Ed. 2d 668, 92 S. Ct. 2423.) Again, the standard of proof under this rule varies with the courts applying it, some requiring certainty of discovery (*Crews v. United States* (D.C. 1978), 389 A.2d 277, *rev'd on other grounds* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244), some requiring only a reasonably strong probability (*People v. Superior Court* (1978), 80 Cal. App. 3d 665, 293 P.2d 33, 145 Cal. Rptr. 795, 799), and some demanding almost no showing at all (*Commonwealth v. Garvin* (1972), 448 Pa. 258, 293 A.2d 33). Yet numerous courts have rejected the rule because of its speculative nature and the negative impact it has on the deterrent rationale of the exclusionary rule. *United States v. Houltin* (5th Cir. 1976), 525 F.2d 943, 949, *cert. denied* (1978), 439 U.S. 826, 58 L. Ed. 2d 118, 99 S. Ct. 97; *Parker v. Estelle* (5th Cir. 1974), 498 F.2d 625, 629-30 n.12, *cert. denied* (1975), 421 U.S. 963, 44 L. Ed. 2d 450, 98 S. Ct. 1951; *United States v. Griffin* (6th Cir. 1974), 502 F.2d 959, 961, *cert. denied* (1974), 419 U.S. 1050, 42 L. Ed. 2d 644, 95 S. Ct. 625, *United States v. Paroutian* (2d Cir. 1962), 299 F.2d 486, 489.

The evolvement of these limitations on the application of the exclusionary rule appears to be an attempt to balance the assurance of fourth amendment protection with the cost to society when pertinent but illegally obtained evidence is excluded from trial and a defendant is set free. However, not all illegally obtained evidence is excluded. Only if the police will be forced to refrain from obtaining such evidence in an illegal manner in the future will the evidence be excluded at trial.

> "[D]espite the broad deterrent purpose of the exclusionary rule, it has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons. As in the case of any remedial device, 'the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" *Stone v. Powell* (1976), 428 U.S. 465, 486-87, 49 L. Ed. 2d 1067, 1083, 96 S. Ct. 3037, 3049, citing *United*

*States v. Calandra* (1974), 414 U.S. 338, 348, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 620.

Yet questions have been raised as to whether the application of the exclusionary rule furthers its underlying rationale of deterring future police misconduct. The Supreme Court in *Stone v. Powell* candidly discussed some of the costs in applying the exclusionary rule at trial.

"[T]he focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. As Mr. Justice Black emphasized in his dissent in *Kaufman* [*v. United States* (1969), 394 U.S. 217, 22 L. Ed. 2d 227, 89 S. Ct. 1068]:

'A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty.' 394 U.S. at 237, 22 L. Ed. 2d 227, 89 S. Ct. 1068.

Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." 428 U.S. 465, 489-91, 49 L. Ed. 2d 1067, 1085-86, 96 S. Ct. 3037, 3050.

More recently, the cost of excluding verbal evidence at trial was specifically addressed in *United States v. Ceccolini*.

"Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, 'serious obstructions to

the ascertainment of truth'; accordingly, '[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions.' C. McCormick, Law of Evidence §71 (1954)." 435 U.S. 268, 277, 55 L. Ed. 2d 268, 277-78, 98 S. Ct. 1054, 1061.

It has also been suggested that the rule has a greater deterrent effect on the prosecutor than on the police when evidence at trial is excluded. This is so because the police generally are not informed that the evidence was excluded and yet the prosecutor rarely has any degree of control over the actions of the police. Oakes, *Studying the Exclusionary Rule in Search and Seizure*, 37 U. Chi. L. Rev. 665, 726 (1970).

Rather than applying the exclusionary rule to all illegally seized evidence, arguments have been made that it would be applied only to illegally seized evidence which is inherently unreliable, *i.e.*, a coerced or induced confession, or a faulty lineup for identification of the suspect. This way the all-encompassing indiscriminate nature of the rule is avoided. (Wilkey, *The Exclusionary Rule: Why Suppress Valid Evidence?* 62 Judicature 214, 222-23 (1978).) Judge Wilkey feels the exclusionary rule, besides not fulfilling its deterrent purpose, suffers from five defects. First, he condemns the rule's "undiscriminating meat-axe approach." "It totally fails to discriminate between the degrees of culpability of the officer or the degrees of harm to the victim of the illegal search and seizure." (62 Judicature 214, 225-26.) Even if the officer was using his best judgment in difficult circumstances and even if no harm resulted from the illegal search, the evidence is excluded. Second, the rule fails to distinguish between minor and more serious offenses, resulting in the wholesale release of criminals no matter what offense they are charged with. Third, the rule, rather than discouraging police misconduct, encourages them to commit perjury in order to convict the accused. (62 Judicature 214, 226; see also Kaplan, *The Limits of The Exclusionary Rule*, 26 Stan. L. Rev. 1027, 1032-33 (1974).) "Fourth, the rule discourages internal disciplinary action by the police themselves." (62 Judicature 214, 226.) An officer being disciplined for a fourth amendment violation by his superiors would short circuit the prosecutor's case before it began or provide grounds for post-conviction relief if subsequent action against the officer were taken. Finally, Judge Wilkey feels that the existence of the rule "makes it virtually impossible for any State, not only the Federal government, to experiment with any other methods of controlling police," for the federally-imposed *Mapp* rule removed the incentive and opportunity to deal with search and seizure by methods other than suppression. 62 Judicature 214, 227.

In conjunction with these criticisms, the State argues, and the majority agrees, that examination of the circumstances surrounding defendant's confessions and the police action in regard thereto provide no grounds for suppressing the confessions because there was no unlawful activity which

needs to be deterred in the future. However, it can hardly be denied that the confessions in question were the fruit of an illegal search. They were a derivative of the search; they followed approximately 45 minutes after defendant stood by and watched the police find contraband in his trunk. Applying the analysis of *Brown v. Illinois*, I believe the *Miranda* warnings were properly given to defendant before he confessed. However, the temporal proximity between the primary illegality (the search) and the derivative thereof (the first confession) was only 45 minutes, which leads me to believe that the threshhold requirement of the voluntariness of the statement was not met. (*Brown v. Illinois*, 422 U.S. 590, 604, 45 L. Ed. 2d 416, 427-28, 95 S. Ct. 2259, 2262; *In re Bizzle* (1976), 36 Ill. App. 3d 321, 325, 343 N.E.2d 633; *People v. Fields* (1975), 31 Ill. App. 3d 458, 468, 334 N.E.2d 752.) Indeed, this court has recognized that "[c]onfronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent." (*People v. Robbins* (1977), 54 Ill. App. 3d 298, 305, 369 N.E.2d 577.) Moreover, there were no intervening factors of great significance between the search and confessions, which further leads me to believe that the statements were made for the sole reason that the tools and grease guns were discovered in the trunk of defendant's car. Thus, it seems clear that "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality * * *." (*Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.)

> "Once the defendant establishes the 'primary illegality' and shows its connection to what are alleged to be the fruits of the illegality, the prosecution then has the burden of establishing by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. *Brown v. Illinois*; *People v. Wilson*, 60 Ill. 2d 235, 326 N.E.2d 378 (1975); *People v. Black*, 52 Ill. 2d 544, 288 N.E.2d 376 (1972)." *People v. Robbins* (1977), 54 Ill. App. 3d 298, 305.

The majority states that these confessions were acts of free will and that any taint was removed because defendant admitted the voluntariness and truth of those statements. In a footnote the majority cites defendant's suppression hearing testimony that he voluntarily waived his *Miranda* rights, was not coerced and spoke truthfully to the police. However, to base their conclusions regarding voluntariness on this testimony is credulous, giving the following remarks by defendant:

> "Q. Mr. Pierce, you stated to your attorney that the reason you gave the first statement was that since they already had this stuff you saw them seize the stuff, you felt it was fruitless to fight?
> A. Yes, sir.
> Q. So it is your testimony it wasn't because you were arrested that

you gave the statement, it was because you actually saw the officers seize the property?

A. Yes, sir.

Q. Your arrest had nothing to do with it then?

A. Yes, sir, that is right.

Q. The fact that you were in custody and under arrest did not lead to the statement you made? By your own testimony it was the fact that you saw the officers find the stolen goods so-to-speak in your car?

A. Yes, sir, that's right.

Q. Now, regarding the second statement, would that be a fair assessment also, that that entered into it?

A. Well—yeah.

Q. It wasn't the fact that you were under arrest? It was the fact that they had found this stuff in your trunk?

A. Yes, sir."

Due to the defendant's insistence that his confessions were catalyzed by the police search of his automobile pursuant to a warrant and in his presence, in conjunction with the short period of time between the search and the statements and the absence of any meaningful intervening circumstances, I do not believe the State has proven by clear and convincing evidence that the confessions were anything but a direct result of the search. The majority's holding to the contrary is without support in the record.

Thus, it has been established that the nexus between the search and confessions was not so attenuated as to dissipate the taint, the latter following hot on the heels of the former. Nor can it be shown, and the State has not suggested, that the confessions would have been inevitably obtained through diligent legal police work. What the majority does say, however, is that the police had evidence in their possession which in fact provided an independent basis for the acquisition of the confessions. This legally obtained evidence includes Chief Sievers' suspicion of defendant's involvement in the burglary because defendant's automobile was observed by him in the early morning hours of January 1, 1979, on the road by the landfill where the burglary had occurred, Chief Sievers' suspicion of Ronald Miller in the same crime because of his presence as a passenger in defendant's automobile when observed by the landfill, Miller's legally obtained confession implicating defendant, and the discovery of two of the stolen items where Miller said they were. H v there could ever be an independent source for the discovery of a confession that had not as yet been made is beyond my comprehension. Be that as it may, the fatal flaw in the logic of the majority is that it was not this legally obtained information which was presented to defendant and caused him to confess, thus providing the basis for the statements. It was the search of his vehicle and

discovery of the contraband which led straight to the confessions. Thus, there was no independent source for these confessions, and it cannot be said that the taint of the illegal search had been removed from the fruit of that search.

Finally, I must speak to the majority's misapplication of the standards announced in *Brown v. Illinois*. The majority has misinterpreted this case in suggesting that "the purpose and flagrancy of the police misconduct is premier in any analysis, and that this factor may alter *or even supersede* any causal or temporal proximity conclusions which might otherwise be made." (*Emphasis added.*) The majority cites numerous cases for the supposed definitiveness of the police activity and stands by the recent case of *Rawlings v. Kentucky* (1980), 448 U.S. ___, 65 L. Ed. 2d 633, 100 S. Ct. 2556, as one which allegedly promotes that factor as *the* controlling consideration in any case such as ours. However, a review of that case demonstrates otherwise.

The Supreme Court in *Rawlings* began its consideration of whether the petitioner's admission to ownership of the drugs was a fruit of an illegal detention by quoting the following passage from *Brown v. Illinois*:

> " 'The question whether a confession is the product of a free will * * * must be answered on the facts of each case. No single fact is dispositive.' " (*Rawlings v. Kentucky* (1980), 448 U.S. ___, ___, 65 L. Ed. 2d 633, 643, 100 S. Ct. 2556, 2562, quoting *Brown v. Illinois*, 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261.)

The court went on to describe the four *Brown* factors of *Miranda* warnings, temporal proximity, intervening circumstances, and official misconduct, and subsequently applied each element of the analysis to the facts of the case.

The court stated that Rawlings had received *Miranda* warnings only moments before his statements, an important but not dispositive consideration. As for temporal proximity, the court took note of detention for 45 minutes and said:

> "Although under the strictest of custodial conditions such a short lapse of time might not suffice to purge the initial taint, * * * '[A]ll witnesses for both sides of this litigation agreed to the congenial atmosphere existing during the forty-five minute interval' * * * [such] that these circumstances outweigh the relatively short period of time that elapsed between the initiation of the detention and petitioner's admissions." (448 U.S. ___, ___, 65 L. Ed. 2d 633, 643-44, 100 S. Ct. 2556, 2563.)

With respect to intervening circumstances, the court recognized Rawling's "apparently spontaneous reactions to the discovery of his drugs in Cox's purse" (448 U.S. ___, ___, 65 L. Ed. 2d 633, 644, 100 S. Ct. 2556, 2563), and the testimony of other witnesses that Rawlings was not going to let Cox

suffer for him. Finally, as for the conduct of the police, the court held that while the detention of an individual while seeking a search warrant may be an open question, "the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements." (448 U.S. ___, ___, 65 L. Ed. 2d 633, 645, 100 S. Ct. 2556, 2564.) Thus, the *Rawlings* court applied the total *Brown* analysis and did not promote any one factor at the expense or exclusion of the others.

The majority continually emphasizes the adjectives "conscious" or "flagrant" when speaking of official misconduct. Yet, it concedes, as it must, that police conduct subject to such scrutiny under *Brown* includes negligent as well as willful activity. (*Michigan v. Tucker* (1974), 417 U.S. 433, 447, 41 L. Ed. 2d 182, 194, 94 S. Ct. 2357, 2365.) The Perry County Circuit Court found that the police had inadequately demonstrated the underlying reliability of informant Miller when they applied for their search warrant such that probable cause to search was lacking. I cannot fault anyone but the police and the State's Attorney who applied for the warrant for failure to comply with one of the two requisite warrant requirements of *Aguilar v. Texas* (1964), 378 U.S. 108, 113-14, 12 L. Ed. 2d 723, 728-29, 84 S. Ct. 1509, 1513-14. Nor can I conclude that execution of a search warrant in the presence of numerous police officers, the discovery of incriminating articles of the car, arrest, custody and interrogation, all in an uninterrupted chain, constitutes the sort of congenial atmosphere that breaks up the otherwise short duration of 45 minutes between the illegal search and the confessions. While I admit that the actions of the police and the State's Attorney came nowhere near the abominations present in *Brown*, they still acted pursuant to an invalid warrant of their own making. That, in conjunction with the time proximity and the uninterrupted chain of events from search to confession lead unmistakably to the conclusion that these confessions should be suppressed under the exclusionary rule as it exists today.

The majority has reached its foregone result at the expense of the long development of the law of search and seizure. I cannot help but feel as did Mr. Justice Marshall, with whom Mr. Justice Brennan concurred, in his dissent in the *Rawlings* case:

> "Today a majority of the court has substantially cut back the protection afforded by the Fourth Amendment and the ability of the people to claim that protection, apparently out of concern lest the government's ability to obtain criminal convictions be impeded. A slow and steady erosion of the ability of victims of unconstitutional searches and seizures to obtain a remedy for the invasion of their rights saps the constitutional guarantee of its life just as surely as would a substantive limitation. Because we are called on to decide whether evidence should be excluded only when a search has been

'successful,' it is easy to forget that the standards we announce determine what government conduct is reasonable in searches and seizures directed at persons who turn out to be innocent as well as those who are guilty. I continue to believe that ungrudging application of the Fourth Amendment is indispensable to preserving the liberties of a democratic society." (448 U.S. ___, ___, 65 L. Ed. 2d 633, 652, 100 S. Ct. 2556, 2569.)

Since I likewise feel that the exclusionary rule vindicates every person's right to privacy and right to be free from unreasonable search and seizure, that it was properly applied here, and would affirm the order of the circuit court, I must dissent.